## NATIONAL SURETY CO. v. SILBERBERG BROS. (No. 431.)

(Court of Civil Appeals of Texas. El Paso. April 15, 1915. Rehearing Denied May 13, 1915.)

1. INSURANCE ⟨Key⟩425—BURGLARY INSURANCE—POLICY REQUIRING VISIBLE MARKS OF VIOLENCE—CONSTRUCTION.

Where a burglary insurance policy agreed to indemnify for merchandise abstracted by any person "who has made forcible or violent entrance upon the premises or exit therefrom, of which force and violence there shall be visible evidence," the policy further providing "that the company shall not be liable unless there were visible marks upon the premises of actual force and violence used," the provisions determined what should be one of the evidentiary facts to prove burglary, and not what should be sole proof, since the expressions of an insurance policy, if ambiguous, are to be taken most strictly against the insurer, while preference will be given to any reasonable construction to sustain the claim of the insured to the avoidance of a forfeiture.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1129, 1135, 1143; Dec. Dig. ⟨Key⟩425.]

2. INSURANCE ⟨Key⟩668—BURGLARY INSURANCE—ACTUAL INFLICTION OF VIOLENCE—QUESTION OF FACT.

In an action on a burglary insurance policy, question whether visible marks of entry on the premises, made a prerequisite to recovery by the policy, were inflicted by the insured as a blind, held for the jury.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1556, 1732–1770; Dec. Dig. ⟨Key⟩668.]

3. INSURANCE ⟨Key⟩425—BURGLARY INSURANCE—"VISIBLE EVIDENCE OF VIOLENCE"—"VISIBLE MARKS."

In an action on a burglary insurance policy, which rendered a prerequisite to recovery the infliction of visible marks of violence by the burglars, where the door to the premises was locked previously to the entry, there being a sufficient space to enable a person to see whether the bolt was thrown, and where, in the morning, the proprietor saw that the bolt had been slipped back, there was visible evidence and visible marks of forcible entry, to satisfy the terms of the policy.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1129, 1135, 1143; Dec. Dig. ⟨Key⟩425.

For other definitions, see Words and Phrases, First and Second Series, Visible Mark.]

4. INSURANCE ⟨Key⟩665—BURGLARY INSURANCE—ASCERTAINMENT OF LOSS FROM BOOKS OF INSURED—SUFFICIENCY OF EVIDENCE.

In an action on a burglary insurance policy, evidence held sufficient to support finding that the insured had accurately determined his loss from his books with reasonable certainty, as required by the policy.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1555, 1707–1728; Dec. Dig. ⟨Key⟩665.]

5. APPEAL AND ERROR ⟨Key⟩1001 — REVIEW — FINDINGS OF JURY.

A finding of a jury that has support in the evidence cannot be disturbed on appeal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3922, 3928–3934; Dec. Dig. ⟨Key⟩1001.]

Appeal from County Court, El Paso County; A. S. J. Eylar, Judge.

Action by Silberberg Bros. against the National Surety Company. Judgment for plaintiffs, and defendant appeals. Affirmed.

Jones, Jones & Hardie, of El Paso, for appellant. Goldstein & Miller, of El Paso, for appellees.

HARPER, C. J. This is a suit on an indemnity contract against burglary for the value of merchandise feloniously abstracted from appellees' store. Tried by court with jury, and verdict and judgment for $197.05, from which this appeal is perfected.

Appellant by his assignments proposes, as we view them, only two questions for our determination: (1) Does the evidence as to the commission of a burglary bring appellees' case within the provision of the policy that there should be visible marks upon the premises of the actual force and violence used in making the entry? (2) Does the evidence adduced satisfy the provision of the policy that appellees had so kept their books and accounts as that the actual loss could be accurately determined?

### Findings of Facts as to First Proposition.

The National Surety Company issued to Silberberg Bros. an insurance contract, agreeing to indemnify them for direct loss by burglary of any merchandise feloniously abstracted from their store by any person or persons "who have made forcible and violent entrance upon the premises or exit therefrom, of which force and violence there shall be visible evidence." Again, the contract contains the "special agreement" that "the company should not be liable unless there are visible marks upon the premises of the actual force and violence used in making entry into the said premises or exit therefrom."

On the evening of the night of the burglary, the doors of the store of appellees were locked with a bolt lock turned by a key. The morning following the burglary, Ramon Gonzales, whose duty it was to lock the store in the evening at the close of business and open it next morning, entered the store by the front entrance and locked it. Shortly after he entered the store, the porter came in through the side door. Gonzales not having unlocked that door, and the porter carrying no key, his attention was thus attracted to the door, and an inspection showed that the bolt or lock had been thrown. He then looked around the store and discovered the gold chains missing from the show window. Gonzales' testimony on this issue was as follows:

"There was no one in the store when I went in. The next person who came into the store was the porter, who came through the side door. He did not keep a key to that door. As to what called my attention to his coming through the door, I did not unlock that door. I heard him when he opened the door, and I came out to see who was coming. As to what I then found wrong, I found some chains short

in one of the show windows. I asked the porter how he came in. After he came in I examined the door. As to what was the condition of the lock then, it was just opened up. The bolt was thrown. I had thrown the bolt to when I left there that night. The chains were missing from the second window from Texas street, the window facing Mesa avenue."

To open the door, Gonzales testified you had to take a key and turn it; that it required no great effort to do that.

The porter testified that, upon his coming into the store, he was approached by Mr. Gonzales and asked how he entered, and Gonzales then went over and examined the door.

A. Silberberg testified that, upon being notified of the burglary, he came to the store. Upon entering the store, he found half the chains missing from the window; that, in closing the evening before, everything was in perfect order. He testified that the door, which was found unlocked, locked with a bolt which was thrown with a key. When the lock is thrown, you could see from the inside of the door whether it was locked or not, because there is a space of about one-sixteenth of an inch between the panel of the door and the door proper, through which the bolt is readily visible, and from which you can readily determine whether the door is locked or unlocked. He further testified as to the visible evidence of the force and violence used in making entrance to the store and evidence of visible marks as follows:

"As to what visible marks I found in our store of a burglary, I found that the bolt of the side door had been thrown open; likewise that half of the display of these gold chains were not in their place in the window, which was visible to me. There were two bolts in that door; both of them are operated with a lever; one is a day catch, and the other one is thrown with a key. You throw a day catch back and forth by pressing the lever down; no key is required for that. That is not the one that was thrown back; it was the other one; you have to operate the other one with a key. I determined that the bolt had been thrown, because it is visible, because there was an air space between the frame of the door of about one-sixteenth of an inch. By looking in that I could see whether or not the bolt was thrown. I did that on that particular occasion; that was the first thing I did. I was very curious that morning."

Robert Carstair also testified that the visible evidence of the burglary was the unlocking of the door, the missing chains, and the scattered tags.

[1] It will be noted that there are two separate and distinct stipulations in the contract sued on. The first is: There must be visible evidence of the force and violence used in effecting the entrance into the premises. The second is: The company shall not be liable unless there are visible marks upon the premises of the actual force and violence used in making the entry into the premises.

"The language used in the policy of insurance is that chosen by the insurance company. The insured exercised no choice in that connection, but in order to insure his property he was compelled to accept a policy whose * * * con-ditions [therein contained] were dictated by the insurer." In such cases "it is the universal rule that, if the language of any condition in the policy is of doubtful meaning or import, that construction which is most favorable to the insured is to be placed upon it." London & L. Fire Ins. Co. v. Davis, 37 Tex. Civ. App. 348, 84 S. W. 260.

"An additional reason for construing a condition of doubtful import in favor of the insured is that the law does not favor forfeiture, and will always give the preference to that reasonable construction which will sustain the claim of the insured. Therefore, before a forfeiture will be declared, the facts must bring the case clearly within the terms of the condition expressed in the policy. Brown v. Palatine Ins. Co., 89 Tex. 590, 35 S. W. 1060."

Again, the words used in setting forth the conditions must be used in their ordinary sense, and according to the evident intention of the parties to the contract. No forced construction is permissible, but the sense in which the words were used must be arrived at in the light of the surroundings of the parties, to arrive at the intention they had when used. The construction must have for its object indemnity for the insured, and any fair interpretation of the policy that will give indemnity must be adopted, and every ambiguity must be resolved in favor of the insured. Construing the wording of the provisions of the contract sued on in the light of the above rules applicable to similar contracts, it is evident that the parties intended to agree upon what should be one of the evidentiary facts which should constitute the proof of burglary and the theft of the goods, and not that it should be the sole proof.

[2] If the words "visible marks" in the second provision could reasonably have been construed by the insured (we think they could) to mean the same as "visible evidence" in the first provision, the contract is ambiguous, because the parties to it may not have understood its meaning alike. The thrown lock bolt was unquestionably evidence of force and violence. No one would contend that it did not take force to throw a bolt back into a lock, even if a key be used in doing it. "Force" and "violence" are synonymous terms. If there had in fact been an abrasion, a scratch, or a splintered door, or any mark upon the premises, the same proof would have to be made as to the other elements of burglary as if only the thrown bolt was the visible evidence of the violence, to wit, the plaintiff must be able to prove to the satisfaction of the jury that there was an actual burglary, an entrance by force with the intention to commit theft, and in this case an actual theft; must have been able to prove by competent witnesses that he (the plaintiff) or any one at his connivance, did not make the *marks* as a blind, likewise with the thrown bolt. The contract was ambiguous, and the proof is such as to authorize the court to submit the question to the jury as was done. Royalty Casualty Co. v. Nelson, 153 S. W. 674.

But we are of the opinion that, under the most strict construction of the contract, the evidence adduced, under the rules above quoted, brings the appellees' case within the clear meaning of the provisions of the contract sued on.

[3] When we consider the two terms as being synonymous in their ordinary sense or use, "visible evidence" and "visible marks," and that the unquestioned evidence is that the door to the premises was locked the night before, that there was a sufficient space between the shutter and the door proper to enable a person to see that the door was locked by reason of the fact that the bolt was thrown into the casing, or to see that it was not locked by reason of the fact that the bolt no longer appeared in the space between the door and the casing, we have the visible evidence of the force and its synonymous term, "violence," which was used in effecting the entry.

The instant case is not unlike that of Royal Casualty Co. v. Nelson, 153 S. W. 674, which was a suit upon an accident policy containing the provision that, to hold the company liable, there must be "visible marks upon the body." In that case it was held that it need not be a bruise, laceration, or broken limb, but may be any visible evidence of an internal injury. It need not be upon the surface of the body, but might be any physical effect observable from an outward indication, which revealed an inward condition of the internal organs of the body. There can be no difference between the words "visible marks on the body," as construed in accident policies, and the words "visible marks upon the premises," as they should be applied to a policy of burglary insurance. So, in the light of the above opinion, and it is clearly in line with the holdings in Texas, we reason:

If, to prove "a visible mark upon the body," the proof need only be any visible evidence of an internal injury, not upon the surface, but one from which the effect is observable, it seems that the unlocking of a door, the raising of a window, would be sufficient to show the actual force used in effecting the burglarious entry. To put the construction on the words "visible marks" that some abrasion, stain, or something indicating entry at that place, must be made on the door, makes a very literal application of the words "visible marks," would prevent recovery on the policy, though every door was unlocked and opened, and every window unfastened and raised, if some abrasion, or something in addition, was not made on the premises in opening the door or window. We are of the opinion that the unlocked door is a sufficient evidence of "visible marks" upon the premises, of the actual force used in making the entry, to bring appellees' case within the literal meaning of the provisions of the policy above quoted, es-

pecially in view of an affirmative finding to that effect by the jury.

[4, 5] This brings us to the question: "Were the plaintiff's books and accounts so kept that the loss could be accurately determined therefrom?"

The witness testified as follows:

"As to what system we have of tagging chains and jewelry that we put in the windows, loose tags are set with their visible figures, so they can be easily read by any passer-by or anybody that stops in front of the windows. On the night of this particular occasion, there were tags in that window, rather large tags, with their visible figures, so that anybody who might be attracted to the window, or take any interest in it, could readily see the price of each article. We had the tags for each article in the window. When I came down that morning, some of the tags were in the window, and some of them had been gathered; I don't know who gathered them from the window. I made a list of those figures. From those figures I am able to determine the cost price of the article that they represent. From these figures I figured out the cost price of these chains that were missing, and I made a list of them. I gave a list to the insurance company. I have a copy of that original list. I made out this list on the morning when the burglary was discovered. This is a true copy of the list that I furnished to the defendant, insurance company. That is a correct statement as appears from those tags. This list is correct. The price that I state there is the original invoice price of the goods, without any addition for freight or express or anything more—just the invoice price. That is not the selling price. That is a true and correct statement of the cost price of the goods to Silberberg. This is the fair market wholesale value of these goods, and nothing more. I do not know what became of those little tags that were in the window. I keep the papers and records of Silberberg Bros. I have not these particular tags that were there. This statement that I gave you there is a correct and accurate statement of what was shown on those tags. This statement or list shows the particular item designated by those tags; it was made within a couple of hours; by 10 o'clock that morning the whole list had been made; each item had been identified and connected with the original invoice, and the cost thereof noted, one by one. I have got there the particular numbers, No. 148, etc. As to where I got those numbers, they must have been gotten from the tag there, by connecting it with the invoice of the merchandise, of the merchant from whom the goods had been bought, and even the date of the invoice was ascertained and noted on the list. From these tags in the window, I am able, with the invoices, to determine each particular item or chain that was missing; that by turning to the invoice, I got the cost price, and I did that; and this list is the result of my work. From the tags I am able to get the invoice of these particular goods, and from the invoice I am able to get the manufacturer's name and the wholesale price charged to Silberberg Bros., and I did that in this case. This is a correct statement. It is a statement of the missing items from the window, with the invoice price to Silberberg Bros."

The witness R. Silberberg testified on this issue as follows:

"I then proceeded to identify the cost of the merchandise by the tags which remained there, which I did very easily. The selling price of certain merchandise, such as 10 karat chains, are up to a certain figure, that I identified by a certain mark, and by my own knowledge also; and the 14 karat chains likewise, by the selling price. It is no secret among the jewelers that

14-karat goods, such as chains, carry a certain percentage. To be more specific, 50 per cent. above the cost of the merchandise, which would be 33⅓ per cent. of the gross as a selling price. In order to verify the invoice cost, I would reduce that to this basis, then I would hunt through my chain invoices and find the identical number on the invoice, and naturally the cost of the chain, and that would conform with the sale price as found in the window. That is how I arrived at it. From this selling price in the window, I deducted the standard profit I made on them, within a fraction; for instance, if the figure was $19.37, it was marked $19.50. Then I went to the original invoice of the chain manufacturer we bought from, such as C. Sidney Smith, or other manufacturer; then with these tags I went to the invoice and found the exact price. After having determined the cost price, I could then, by examining all my invoices, determine the price of the chains missing, and I did that. The selling price figures on these tags were made by Mr. Gonzales. As to who instructed him to put them on these tags, my general instructions to him are always to get the cost of the merchandise that is put in the windows. Mr. Gonzales is our window trimmer, and the boy that opens and closes the store; he seldom waits on the trade. He made the figures on these particular tags. He got the information to put these figures on these particular tags from the retail selling price of the merchandise that he placed in the window; that is, the tag attached to the chain. The selling price is never placed on the merchandise except by the principals, my brother and myself. It doesn't follow that I should have attached the tags to the chain, but it is attached by some employé sitting next to me when I make it. It might not have been done by myself, because my brother is also there, but either of us sees it done."

The witness A. Silberberg testified that he had his invoice with him, and that from the invoice he could pick out, and did pick out, each chain that was taken, and that all these invoices had been entered into the proper books and were shown by their books.

The Court of Civil Appeals, in Ætna Insurance Co. v. Fitze, 34 Tex. Civ. App. 214, 78 S. W. 370, in construing a similar provision in insurance contract, held that it was sufficient if the loss could be determined from the books as kept with reasonable certainty. In this case the jury have found that from the evidence the books and accounts were so kept that the actual loss was accurately determined therefrom. And the finding is supported by the evidence, therefore cannot be disturbed.

Finding no error, the cause is affirmed.