ELLA A. COLLINS, Appellant, v. PHOENIX ASSURANCE COMPANY LTD., of London, Respondent.*

In the Kansas City Court of Appeals, February 11, 1924.

1. **INSURANCE: Proofs of Loss: Admissions: Issue as to Whether Automobile was Rented in Violation of Terms of Theft Policy Held for Jury.** In an action to recover upon a policy of theft insurance for loss of an automobile, admissions contained in a proof of loss in reference to renting of automobile were not conclusive against insured, and where her testimony corroborated by her daughter, was to the effect that the proofs did not correctly record her answers to material questions, and she having denied renting the automobile at the time it was stolen, and denied having made the statements contained in the proof of loss from which defendant contends a rental was shown, the question of whether automobile was rented was an issue of fact for the jury, and court erred in sustaining demurrer of defendant.

2. **——: ——: ——: Evidence: Admissions in Proofs of Loss Are Not Conclusive Against Insured Where There is Evidence Showing They Were Erroneously Made.** Admissions contained in proofs of loss are not regarded as conclusive against insured where there is evidence showing that they were erroneously made or tending to explain, repel or contradict them or tending to impair their force and effect.

---

*Headnote 1. Motor Vehicle Insurance, 28 Cyc, p. 50 (1926 Anno); 2. Insurance, 32 C. J., Section 666.

Appeal from Circuit Court of Jackson County.—*Hon. Thos. B. Buckner,* Judge.

REVERSED AND REMANDED.

*I. M. Lee* for appellant.

*Bruce Barnett* for respondent.

ARNOLD, J.—This is an action to recover on a policy of theft insurance. The record discloses that defendant executed its policy of theft insurance on a new Ford touring car in the sum of $500, on July 9, 1918, for a term of one year from that date. It is alleged the car was stolen August 6, 1918, and that its value then was in excess of $500. Payment of loss was refused on the ground that the automobile was rented when stolen, in violation of one of the conditions of the policy.

The case was tried to a jury and at the close of plaintiff's evidence defendant asked a peremptory instruction in the nature of a demurrer. Arguments thereon were heard by the court, out of the presence of the jury, and the instruction was marked ''Given.'' Plaintiff excepted to said ruling of the court and her counsel was asked if a directed verdict were desired, whereupon plaintiff took an involuntary nonsuit with leave. Afterwards plaintiff's motion to set aside the nonsuit was overruled and plaintiff appeals. Defendant has filed no brief herein.

As the case is before us on the question of the demurrer, it is necessary to review the evidence.

The record shows that the policy sued on was issued to plaintiff to cover a new Ford touring car which she bought on the day the policy was issued. It is shown that plaintiff's family owned another car of the same type and had owned it for five or six months, or longer. The latter is referred to in the evidence as the ''old'' car and the one covered by the policy in suit is called the ''new'' car. In the forenoon of the day on which the car was stolen one Don Thompson called plaintiff over

the telephone and asked if her son were there, and was informed that the son was out of the city; within an hour or so, Thompson again called by telephone and asked about the use of the car, suggesting that in view of the son's absence he would like to take the car himself. It is shown that plaintiff's son, on previous occasions, had driven Thompson for hire, in a car owned by the son.

Plaintiff testified that when Thompson telephoned the second time she thought he referred to the old car, and she told him it was being repaired. Later in the day, Thompson telephoned a third and a fourth time and in one of the conversations asked plaintiff for the use of the new car if the old one had not yet been repaired, and plaintiff told him he could not have that car because it was kept for her private use. Thompson's last telephone call was about noon, and plaintiff told him she did not know whether the old car had been repaired or not; that she then was starting from her home, which was at No. 1414 Bellefontaine Avenue, to go to the grocery store of her husband at Thirty-first Street and Prospect Avenue. The evidence tends to show that Thompson resided within a block of said grocery store, but of this fact plaintiff testified she was at that time in ignorance. She testified that in one of the telephone conversations with Thompson, she told him she would be at the grocery store but a short time.

In making this trip to the grocery store, the new car was driven by plaintiff's son-in-law whose wife sat in the seat beside him, and plaintiff sat alone in the rear seat. On the return trip the same relative positions were retained by the occupants. When they were within two or three blocks of plaintiff's house, Thompson was seen on the sidewalk and was signalling the driver (Kinsey) to stop. Kinsey did not stop but slowed down and Thompson got in the car and sat beside plaintiff for the short distance remaining to plaintiff's home. When the car was stopped in front of her house, plaintiff got out immediately and hurried into the house and back into the kitchen. There was no conversation between plaintiff

and Thompson during the short period they were together in the car, nor on arrival at plaintiff's home. Kinsey and his wife alighted and Thompson got in the front seat and drove the car away. Mrs. Kinsey testified that she told Thompson at this time that she desired to use the car and that he replied he would be back soon.

Shortly after plaintiff entered the house, her young son, Lindell, who was playing in the yard, ran to his mother and told her that "a man has gone with the car." Plaintiff testified she then rushed to the door but the car had turned the corner and was out of sight. This occurred at the noon hour between 12 and 1 o'clock. About 5 o'clock that afternoon, Thompson called plaintiff by telephone and told her the car had disappeared from in front of the Palace Clothing Company's store, where he had left it. That night about 10 o'clock, Thompson went out to plaintiff's home and there was told by plaintiff that if the car could not be returned by him, he would have to pay for it. He then said he had only a check for $10 and would give her that; that she refused to take it, whereupon Thompson went out, cashed the check and then gave plaintiff $10 in cash. Plaintiff stated that at no time had she told Thompson he could take the car, but told him he could not take it.

On being notified of the theft, defendant asked plaintiff to come to the office of defendant in Kansas City. She visited the office and was told by a Mr. Shirley, the company's adjuster, that she would be required to make a statement covering the circumstances of the loss before she could get the insurance. She gave a statement in the form of questions asked by the adjuster and answers by plaintiff taken down by defendant's stenographer. Some days later plaintiff went again to defendant's office and a statement was handed to her by the stenographer who, in the meantime, had transcribed said questions and answers, and plaintiff signed the statement without reading all or any part of it, though she could have read it.

As a part of the cross-examination of plaintiff the statement, so signed, which was sworn to, was introduced in evidence. Its purport is that D. E. Thompson was in charge of the car; that he had never previously driven the car but had driven plaintiff's son's car several times. "I did not want to let him him it, but he insisted inasmuch as my boy had let him have his car, and kept calling me up so I let him have it . . . about five o'clock he called me and said: 'Did you come and get the car?' I said, 'No, I never did, you haven't let the car get stolen, have you?'" She states she grew uneasy and went to where Thompson lived but was told by his mother "He does not live here, I don't know where he lives;" that Thompson came to plaintiff's house that night about 10:30, in a big Packard car; that a woman was with him who looked like the woman he said was his wife. "He came upon the porch and I tried to get an account of the whole thing and began to catch him in stories . . . I began to cry and asked him if he was going to pay me for this, as I haven't enough insurance to cover this car."

The following questions and answers were incorporated in the statement: "Q. How much did Thompson pay you for the use of the car that was stolen? A. He paid me $10.

"Q. Did he pay you by cash or check? A. He gave me a check and I told him I wanted the cash, so he went to get the money and I did not expect to see him again, but he came back and gave me the money.

"Q. What agreement as to cost to him did you have when he took the car? A. That I would charge about what the charge is, $1 an hour.

"Q. That was the understanding when you let him have the car that he was to pay you $1 an hour for the time he used the car? A. Of course we really never came to any understanding, but I expected he would pay me about the same as if the boy had taken him.

"Q. And he paid you $10 for this trip? A. Yes, he paid me that inasmuch as I told him he had taken the car out and had not brought it back.

."Q. He paid you in cash? A. Yes."

Among others, the following questions addressed to plaintiff's daughter, Mrs. Kinsey, were included in the statement:

"Q. You do not know anything about Thompson living in that neighborhood, but that he used your cars several times, paid for the use of same and always returned them in the regular way, or made his word good? A. No.

"Q. You do not know that he has been arrested five or six times and charged with stealing automobiles? A. I should say I do not.

"Q. You do not know that he is out on bond now for stealing an automobile? A. "No, I do not.

"Q. You do not know that he is about one of the worst automobile thieves in the country? A. I do not. You see if my husband had been home it might have been different."

On the witness stand plaintiff denied telling the adjuster that she finally let Thompson have the car or ever consented to his taking it and denied that she had said the charge would be a dollar an hour or any other amount for the use of the new car. Mrs. Kinsey, the daughter, who was present when the statement was taken by the adjuster and answered some questions put to her, testified her mother did not tell the adjuster she had consented to Thompson's taking the new car, but that she said she finally let him have the old one; that in taking the statement the adjuster had worded most of the answers. She corroborated the testimony of plaintiff with reference to the telephone conversations with Thompson on the day in question to the effect that plaintiff had told him he could not have the new car. Plaintiff's testimony with reference to Thompson's act in driving the car away without her knowledge or consent was corroborated by both Mrs. Kinsey and the boy, Lindell.

The evidence shows that since the loss of plaintiff's car, Thompson has served a term in the Kansas Penitentiary for theft of an automobile and that at the time

of the trial he was serving a term in the Missouri penitentiary for a similar offense. The last few sentences of the statement above quoted indicate that the adjuster knew Thompson as "one of the worst automobile thieves in the country."

The theory of the defense and evidently the one adopted by the trial court was that the signed statement could not properly be explained, contradicted or denied, and as plaintiff admitted having signed it, she was estopped from denying it; that it was an admission against interest and conclusive against plaintiff, and that said statement showed she had rented the car to Thompson in violation of one of the conditions of the policy.

We are not enlightened by the record as to the basis of the court's ruling on the demurrer, but may assume it was sustained upon the general ground that plaintiff failed to make a case to go to the jury. The demurrer was argued, but the arguments are not contained in the record. We find, however, the motion for new trial reads: "The court erred in ruling that the statement taken by the adjuster for the defendant and signed by plaintiff could not be explained or contradicted by plaintiff." As the motion for new trial was overruled, we may conclude that the statement afforded the basis for the court's ruling.

In Remfry v. Ins. Co., 196 S. W. 775, it is said:

"It is true that proofs of death furnished the insurer by a beneficiary in accordance with the provisions of the policy when making application for its payment to the insurance company as provided therein are admissible in evidence against the beneficiary in a suit upon the policy. Admissions therein contained, however, are but prima-facie binding upon the beneficiary as admissions against interest, and may be overcome by proof adduced tending to explain them. In no event can an admission of this character be conclusive against plaintiff as a matter of law . . ."

It was held by the St. Louis Court of Appeals in Frazier v. Ins. C., 161 Mo. App. 709:

"The sole proof which defendant relies upon as conclusive against the plaintiff, consists of the statements in the doctor's certificate. Being contained in the proofs of death, they were admissible in evidence against the beneficiary as admissions by her of the truth of the statements therein contained. But such admissions are not conclusive against her, since there are no elements of estoppel in the case. [Citing cases.]   It was competent for her to explain the alleged admissions, and to show that she was under a mistake in making them, to prove any other circumstances which will do away with their effect. [Duncan v. Matney, 29 Mo. 368; Wild v. B. & L. Assn., 60 Mo. App. 200.]   The evidence before us is uncontradicted that the plaintiff made the doctors' certificates a part of the proof of death in the hour of her bereavement, amidst the distraction incident thereto. They were not read to her, nor were their contents, or purport explained.  She was without her glasses, hence could not read.  She signed where she was told to sign. All this would have justified the jury in giving no effect to the so-called admission.   This contention is ruled against defendant."    To the same effect is Parker v. Ins. Co., 232 S. W. 708,—Mo.—, wherein is cited Supreme Lodge v. Beck, 181 U. S. 1. c. 56.   A case in point is Bultralik v. Ins. Co., 233 S. W. 250, where it is said:

"Admissions contained in the proofs of death, furnished by a beneficiary under a policy of insurance, are not to be regarded as conclusive against him, where there is evidence introduced tending to show that they were erroneously made or tending to explain, repel, or contradict them, or tending to impair their force and effect." [See, also, Castens v. Knights, etc., 190 Mo. App. 57; Clarkston v. Ins. Co., 190 Mo. App. 624; Bruck v. Ins. Co., 185 S. W. 1. c. 757]

Under these rulings we hold plaintiff had the right to deny her admissions recorded in the proof of loss. The testimony of plaintiff, corroborated by her daughter, is to the effect that the statement did not correcly record plaintiff's answer to material questions.   Plain-

tiff denied having rented the car to Thompson and denied having made the statements contained in the proof of loss of from which defendant contends a rental was shown. This testimony was substantial and made the issue one of fact for the jury.

For the reasons above stated, we hold the court erred in sustaining the demurrer offered by defendant. The judgment is reversed and the cause remanded for a new trial. All concur.