**GREAT CENTRAL INSURANCE COMPANY, Appellant,**

v.

**M. D. COOK, Appellee.**

No. 16996.

Court of Civil Appeals of Texas.

Dallas.

Dec. 15, 1967.

L. W. Anderson, Dallas, for appellant.

Don Hinds, of Yarborough, Yarborough & Johnson, Dallas, for appellee.

CLAUDE WILLIAMS, Justice.

Alleging that on the 17th day of March, 1966 his service station had been burglarized, causing him to lose property valued at $2,500, M. D. Cook brought this action against Great Central Insurance Company to recover for such burglary loss pursuant to the terms of an insurance policy issued by defendant and which was in full force and effect at the time of such loss. The insurance company answered with a special plea that its policy defined burglary as meaning the felonious abstraction of insured property from within the business premises by a person making felonious entry therein by actual force and violence as evidenced by visible marks made by tools, etc. upon, or physical damage to, the exterior of the premises at the place of such entry, and since in this instance there were no visible marks of forcible entry the policy provisions were not applicable and the insurance company was not liable for the loss. It filed its motion for summary judgment based upon the same proposition and pointed to the sworn proof of loss filed by Cook in which he had stated that there were no visible signs of entry. The court overruled the motion for summary judgment.

Following trial before the court and a jury a special issue verdict was returned in which it was found that (1) a burglary, as that term was defined by the court, was committed upon the premises of plaintiff on March 17, 1966 and (2) plaintiff sustained loss in the sum of $1,640 as a direct and proximate result of such burglary. Based upon such verdict the court rendered judgment for Cook in the amount of $1,500, with interest, being the maximum amount of insurance provided in the policy.

■ By its first point of error appellant contends that the court erred in failing to sustain its motion for summary judgment. The trial court's action in overruling appellant's motion for summary judgment may not be considered by us. The precise question was presented to the Waco Court of Civil Appeals in Texas City Hotel Corp. v. Wilkenfeld, 410 S.W.2d 860, 861 (Tex.Civ. App., Waco 1966, writ ref'd n. r. e.), wherein the court said:

"Where there has been a conventional trial on the merits, as here, the interlocutory order overruling a motion for summary judgment is not reviewable. Ackermann v. Vordenbaum (Tex.Sup.1966), 403 S.W.2d 362, 365."

To the same effect see Triplett v. Shield, 406 S.W.2d 941 (Tex.Civ.App., Eastland 1966, writ ref'd n. r. e.), citing Tobin v. Garcia, 159 Tex. 58, 316 S.W.2d 396 (1958). Appellant's first point must be overruled.

By its second point appellant asserts that the trial court should have granted its motion for instructed verdict because (1) there was no evidence to prove coverage for loss and (2) the proof of loss shows as a matter of law that no coverage existed for the loss in question.

The policy sued upon, and admittedly issued by appellant insurance company in consideration for premiums paid, was a "Combination Business Burglary, Robbery and

Residence Theft Policy" and contained the following material provisions:

"DEFINITIONS

"(a) 'Premises' means the interior of that portion of the building at the location designated in the declarations which is shown in the declarations as occupied by the assured in conducting the business as stated therein, but shall not include (1) showcases or show windows not opening directly into the interior of the premises, or (2) public entrances, halls or stairways.

"(b) 'Burglary' means the felonious abstraction of insured property (1) from within the premises by a person making felonious entry therein by actual force and violence, of which force and violence there are visible marks made by tools, explosives, electricity or chemicals upon, or physical damage to, the exterior of the premises at the place of such entry, * * * or (3) from within the premises by a person making felonious exit therefrom by actual force and violence as evidenced by visible marks made by tools, explosives, electricity or chemicals upon, or physical damage to, the interior of the premises at the place of such exit."

"CONDITIONS

\* \* \* \* \* \*

"6. Assured's Duties When Loss Occurs. Upon knowledge or discovery of loss or of an occurrence which may give rise to a claim for loss, the assured shall:

(a) give notice thereof as soon as practicable to the company or any of its authorized agents and and also to the police;

(b) file detailed proof of loss, duly sworn to, with the company within four months after the discovery of loss."

It is undisputed that about 7:00 a. m. on the morning of March 17, 1966 M. D. Cook opened his service station at 1132 East Ledbetter Street in Dallas and discovered that a burglary had occurred. He testified that the night before he had locked up the station, including all of the doors. When he arrived at the station the next morning he found that the door to the men's restroom had been opened and that the towel rack had been pulled away from the wall within the restroom causing an opening through which the burglar or burglars had entered. Cook immediately telephoned the police who sent an officer to investigate the loss. Cook also notified the insurance company immediately and a duly authorized representative of appellant, Mr. Cecil Wilder, went out to Mr. Cook's place of business several days later and prepared the proof of loss himself. The proof of loss was upon a form supplied by the insurance company and Mr. Wilder testified he filled it in based upon facts as told him by Mr. Cook. Mr. Cook testified that he signed the proof of loss and appeared before a notary public and swore that the statements contained in the proof of loss were true "to the best of his knowledge and belief." Upon the printed form of proof of loss was the statement: "Describe occurrence fully", to which Mr. Wilder had written in "Must have had key to get in." Thereafter appeared the printed question: "Were there visible marks of forcible entry?" to which Mr. Wilder had written in "No". The next printed statement was "Describe fully" to which the answer had been written in "Unlock rest room. Pull towel rack out Went through hole."

Mr. Wilder testified that he examined the premises at the time he took the proof of loss and based upon his experience in investigating such claims he was of the opinion that there were no visible signs of forcible entry on the restroom door. He stated that after making his inspection and after

getting the information from Mr. Cook which he put down on the claim form he then advised Mr. Cook that "it was not covered." He said: "I denied the claim, I says, 'Mr. Cook, it has to be marks of forceable entry to the exterior of the building,' which there were not any." He said that he told Mr. Cook that even though the claim was denied that he should go ahead and send in the proof of loss and "let the company make it official."

Mr. Cook testified that Mr. Wilder wrote down the answers in the proof of loss and told him that the company would pay the claim if he would send in the proof of loss.

The testimony as to visible signs of forcible entry is conflicting. Mr. Cook testified that when he arrived at work the morning following the burglary that he observed two or three little marks right around the knob of the restroom door at a point where the tongue of the door lock pushes in. He said that the tongue of the door lock was bent in. He could not tell from the type of marks that were there what type of instrument was used.

Mr. Ezra Smith, who had been employed at the service station, testified that when he arrived at work on the morning in question he observed scratches on the door of the restroom; that such scratches were around the door lock; that such scratches were from an inch to an inch and a half long. He said:

"Q How big were they?

"A They looked like a pinch bar or big screwdriver or something like that.

"Q I see. Did they make a groove in the paint in any way?

"A Yes, sir.

"Q Take the paint off?

"A Yes, sir."

Several witnesses, including the insurance representative and the police officer making the investigation, testified that they ob-served no scratches or marks on the outside of the restroom door.

The testimony concerning forcible exit, as covered by Subdivision (3) of the definition of "Burglary" contained in the policy, may be summarized, as follows:

Mr. Cook testified:

"Q Did you observe any type of damage done to the premises of the service station when you came in that morning?

"A Yes, when I found the dispenser rack in the bathroom torn out, I went back in the station and looked over to see if I could tell that anything was gone, I didn't know what it was at the present time, then I called the police. Then the door on my grease rack, it has two, one grease rack and one wash rack and on the inside the lock had been broken off and the door was opened from the inside where they could go out, I guess. They entered through the rest room door, and undoubtedly broke the lock off of the grease rack door where they could raise the door open to get in."

He further testified:

"Q When the police came to investigate this burglary did you draw their attention to any other damage to the service station other than in the bathroom, men's rest room?

"A Yes, sir.

"Q Would you tell the jury where?

"A Up on your grease rack and wash rack door you have a sliding lock that goes through metal runner on overhead doors and those locks had a padlock on each one of them in case a glass was broken out they would still have to break that lock to get in. That lock was twisted off and broken and laying beside it. I showed it to the policeman and also Mr. Wilder. The padlock was still laying there.

"Q  I want you to describe this cash register that was taken in this burglary.

"A  It was approximately this wide, this high, and it sets on a cash drawer under the bottom of it. Oh, I say its two and a half foot wide at least, and approximately that high and has 110 keys on it.

"Q  Could it have been taken through this towel rack?

"A  No, sir."

On cross-examination he testified:

"Q  Mr. Cook, you have told us that apparently there was some exit made through a grease rack, a door near the grease rack, is that what you're saying?

"A  Yes, sir.

"Q  Where they unlocked the door and went through it.

"A  The lock was broken off. We had padlocks and they got the sliding locks but we also had padlocks on all three doors.

"Q  And you are claiming now that was where they might have exited although you don't know?

"A  No, sir, I don't know, but they had no reason to break that lock off.

"Q  They could have gone out the front door?

"A  Not unless they busted out.

"Q  Can you unlock the front door from the inside?

"A  No, sir.

"Q  How do you unlock the front door?

"A  With a key.

"Q  You mean the key is the only way?

"A  Only way."

Further on cross-examination he testified that the lock had been broken and the door opened but there was no damage to the door itself, only the lock.

M... Wilder testified in response to a question that he did not find any lock that had been broken off on the grease rack door but admitted that he did not look at it. Officer Moroney, who investigated the matter for the Police Department, testified that the opening in the restroom where the towel rack had been torn off was about a foot wide. He said that in his opinion the cash register could not have been carried out through the towel rack hole. He said that he did not make any investigation to determine where exit had been made.

Prior to the time the court submitted the charge to the jury the insurance company filed its motion for instructed verdict based solely upon the proposition that under the terms and provisions of the policy there must be visible marks of forcible entry and since the proof of loss filed by Mr. Cook affirmatively said there were no visible signs of forcible entry Cook was precluded from bringing suit upon the contract. Nowhere in appellant's motion for instructed verdict was it assigned as a ground therefor that there was no evidence in the record of forcible entry or exit which would justify the submission of an issue thereon.

The court submitted Special Issue No. 1 which inquired of the jury to find if a burglary, as that term was defined, was committed on the premises of Plaintiff Cook on or about March 17, 1966. In connection with this issue the court defined "burglary" in the precise language of the policy itself, copied above. Appellant did not object either to the submission of the issue itself nor to the definition accompanying same. The jury found that there had been a burglary.

In view of the facts and circumstances disclosed by this record, as summarized above, we are of the opinion that the trial court did not commit error in overruling appellant's motion for instructed verdict and, accordingly, the point presented must be overruled.

Appellant contends that when an insured complies with the policy provisions concerning furnishing sworn proof of loss, and such proof demonstrates upon its face that the policy provisions are not applicable to such state of facts, the insured is precluded from recovery on the policy, as a matter of law. In support of its contention appellant cites Bank Savings Life Ins. Co. v. Milan, 70 S.W.2d 294 (Tex.Civ.App., San Antonio 1933, writ ref'd), and Shulkin v. Travelers' Indemnity Co., 267 Mass. 160, 166 N.E. 552 (1929), decided by the Supreme Judicial Court of Massachusetts.

The appellee responds to appellant's contention by asserting the rule of law to be that absent facts which would create an estoppel against the insured he is not bound, as a matter of law, by the statements contained in the proof of loss submitted to the insurance company and may alter, change or contradict such statements upon the trial of the case.

A great deal of research of the authorities throughout the United States has led to the conclusion that the decided cases are not uniform on the question here presented. A fair statement of the cases is found in a copious note in Annotation, 58 A.L.R.2d 429, and at page 433 it is stated:

"In making a proof of loss, the insured is usually required to state the cause or origin of the loss for which coverage is claimed, or to relate the essential facts giving rise to the casualty. Such statements have become major issues especially where they narrate circumstances which if true avoid policy coverage. Generally, the insured has been permitted to explain or contradict such statements, and to introduce evidence tending to show that the facts were other than as he originally stated them. But sometimes the insured has been held to such statements, largely because of failure to show justification for not having submitted an accurate statement regarding the origin of the claim earlier or in the first instance."

In support of the general rule the decision of this court in Heckert v. American Casualty Co., 129 S.W.2d 424 (Tex.Civ.App., Dallas 1939), is cited wherein Justice Young, speaking for this court, said that where the insured had made statements in proofs which were contrary to subsequent testimony the prior inconsistent statements contained in the proof were not binding but that it was the jury's province to reconcile such inconsistencies.

No doubt exists in the law that a stipulation in an insurance contract requiring notice and proof of loss within a reasonable time, and on reasonable terms, is valid. 32 Tex.Jur.2d, § 369, p. 569. The obvious purpose for such a provision requiring proof of loss is to afford the insurer an opportunity for investigation, to prevent fraud and imposition upon it, and to enable it to form an intelligent estimate of its rights and liabilities before it is obliged to pay. Couch on Insurance, 2d Ed., § 49:373; Texas Life Ins. Co. v. Jordan, 253 S.W.2d 906 (Tex.Civ.App., Fort Worth 1953, writ ref'd). It is also well settled that substantial compliance with the provision that proof of loss be made is all that is ordinarily required of an insured. 32 Tex.Jur.2d, § 372, p. 577. Concerning the conclusiveness of the proof of loss and right of the insured to correct such proof the general rule is stated in Couch on Insurance, 2d Ed., § 49:438:

"As a general rule, statements made in proofs of loss, injury, death, etc., are not conclusive upon the claimant, provided they were made in good faith and without intent or attempt to defraud the insurer, from which it follows that mere mistakes and bona fide errors therein may be corrected, unless the insurer has acted upon the proofs in such a manner that to permit correction would be inequitable."

As to established principles of construction of such proof of loss provisions out of the same text, § 49:448 states:

"A requirement that proof of loss be furnished following an accident must be

liberally construed in favor of the insured; hence such provision is not to be construed as constituting the insurer the sole judge of the existence or coverage of the alleged loss."

Again, as to proper construction to be placed upon such proof of loss provision, it is stated in Note 2, 58 A.L.R.2d 432:

"It has become fairly axiomatic in insurance matters that technical questions must be construed most strongly against the insurer. This has generally been true in cases determining how far the insured should be bound or concluded by statements appearing in his proof of loss submitted to the insurer in making claim for benefits under an insurance policy. As a result, in the great majority of the cases the insured has not been held rigidly to such statements, and justification has been found to permit him considerable latitude to explain, modify, or even flatly contradict them. Otherwise, the insured would in most instances be deprived, either in whole or in part, of the benefits of the policy, for which he has given valuable consideration, and the aversion of the courts to such forfeitures is well known."

Again, at page 446, 58 A.L.R.2d, it is said:

"Where the insured in his proof of loss has stated facts surrounding the theft or other casualty that would preclude indemnification under the policy, he has normally been permitted to show that the facts actually were otherwise and to recover accordingly. The insured's innocence in including such facts in the proof of loss or the lack of detriment to the insurer have been factors in effecting such results."

In the early case of National Surety Co. v. Silberberg Bros., 176 S.W. 97 (Tex.Civ. App., El Paso 1915), the court was confronted with a similar situation concerning visible marks as evidence of forcible entry under a burglary policy. The court, in construing the terms of the policy itself,

pointed out that no forced construction is permissible and that the words of the insurance policy, being the language chosen by the insuranec company, must be used in their ordinary sense and according to the evident intention of the parties to the contract. The court said: "The construction must have for its object indemnity for the insured, and any fair interpretation of the policy that will give indemnity must be adopted, and every ambiguity must be resolved in favor of the insured."

Again, in an early case decided by this court, Continental Casualty Co. v. Jennings, 45 Tex.Civ.App. 14, 99 S.W. 423 (Tex.Civ. App., Dallas 1907), the proof of loss filled in by the claimant was shown to be false. Justice Rainey, speaking for this court, said:

"Conceding that the statements in the notice of injury as to what work deceased was engaged in at the time of injury was false, we do not see that defendant's liability was affected thereby. It had notice that the injury had occurred, and that death resulted therefrom, and, if it was responsible under the true facts, the misstatement did not relieve it."

In Remfry v. Mutual Life Ins. Co., 196 S.W. 775 (Mo.App.1917), the court passed upon a similar contention, as here made, by saying:

"It is true that proofs of death furnished the insurer by a beneficiary in accordance with the provision of the policy when making application for its payment to the insurance company as provided therein are admissible in evidence against the beneficiary in a suit upon the policy. Admissions therein contained, however, are but prima facie binding upon the beneficiary as admissions against interest, and may be overcome by proof adduced tending to explain them. In no event can an admission of this character be conclusive against plaintiff as a matter of law, * * *."

In Bultralik v. Metropolitan Life Ins. Co., 233 S.W. 250 (Mo.App.1921), a similar contention was raised and the court said:

"Admissions contained in the proofs of death, furnished by a beneficiary under a policy of insurance, are not to be regarded as conclusive against him, where there is evidence introduced, tending to show that they were erroneously made, or tending to explain, repel, or contradict them or tending to impair their force and effect."

For cases of similar import see Collins v. Phoenix Assurance Co., Ltd. of London, 215 Mo.App. 683, 258 S.W. 732 (1904); Stephens v. Metropolitan Life Ins. Co., 190 Mo.App. 673, 176 S.W. 253 (1915); A. W. Sewell Co. v. Commercial Casualty Ins. Co., 80 Utah 378, 15 P.2d 327 (1932); and the Supreme Court of the United States in Supreme Lodge, K. of P. v. Beck, 181 U.S. 49, 21 S.Ct. 532, 45 L.Ed. 741, where the court said: "Statements of proof of loss are not conclusive against the insured, unless it also appears that the insurer has in reliance thereon acted to its disadvantage."

In the more recent case of Standard Bankers Life Ins. Co. v. James, 369 S.W.2d 444 (Tex.Civ.App., Fort Worth 1963), the court had before it the contention of conclusiveness of the proof of loss which, in that case, contained statements which would completely exonerate the insurance company from liability. The court overruled such contention, saying:

"In this case we hold that the representations of fact in connection with the proof of loss were evidentiary only, and did not render improper the judgment awarded the insured. See 22A Tex. Digest, Insurance, Ch. XIV 'Notice and Proof of Loss', ⊕552, 'Misstatements and omissions'; Appleman, Insurance Law And Practice, Sec. 3581, 'Effect of Mistakes and Omissions—Generally'; Continental Casualty Co. v. Jennings, 1907, 45 Tex.Civ.App. 14, 99 S.W. 423; Union Mut. Life Ins. Co. of Portland, Me. v. Payne, 1900 (5th Cir.), 105 F. 172, 45 C.C.A. 193."

■ Based upon what we consider to be the better reasoned authorities on this question we conclude that the facts and circumstances of this particular case are such that appellee was not bound, as a matter of law, to the statements and admissions contained in the sworn proof of loss. We think this is true for several valid reasons.

First, we think that appellee substantially complied with the provision of the policy with reference to giving sworn proof of loss. He answered all of the questions asked him concerning the loss by the insurance company's duly authorized representative who was in the process of filling out the forms in his own handwriting.

Secondly, the questions propounded of appellee both verbally by appellant's representative and by the written questions in the proof of loss form were confined to those relating to the *mode of entry* of the burglar and none were asked concerning the *method of exit*. Mr. Wilder testified that he told appellee that "it has to be marks of forcible entry to the exterior of the building." The printed question inquired of *visible marks of entry*. The policy itself afforded coverage not only for forcible *entry* but for forcible *exit* as well. We do not feel that it was incumbent upon appellee in this case to volunteer information for which he was not asked. Moreover, if the insurance company desired to have any information concerning visible signs of forcible exit from the premises it could have requested appellee to furnish such additional information and he would have been required to do so. The record is silent as to any request by the insurance company for additional information but, to the contrary, the representative of the insurance company promptly denied liability, even prior to the time appellee signed the proof of loss.

Also, the record is silent as to any disadvantage the insurance company might have suffered in reliance upon the state-

ment contained in the proof of loss. It is quite evident from reading this record that the insurance company had every opportunity to, and actually, did carry out a complete investigation of the loss following receipt of the proof of loss. Nowhere is it contended that the insurance company relied upon or was misled by the representation made by appellee in the proof of loss, which would create either legal or equitable estoppel against appellee.

■ By its third, fourth and fifth points of error appellant contends that the answer of the jury to Special Issue No. 1 was (1) not supported by any evidence; was (2) against the great weight and preponderance of the evidence; or was (3) so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and unjust.

We have heretofore set forth a fair summarization of the testimony, indeed conflicting, dealing with the visible signs of entry and exit by the burglar. There was some evidence of probative value to support the jury's answer to the question as to whether a burglary had been committed, both on the theory of entry and exit as contained in the definition of burglary which was given in connection with the special issue. We cannot say that there was no evidence of visible means of entry. Neither can we say that the evidence is contrary to the great weight and preponderance of the evidence.

We believe that the evidence is more conclusive of the question of visible signs of exit from the premises and such would, of itself, justify the answer of the jury to Special Issue No. 1 and support liability against appellant under its policy.

Appellee testified that when he came to work the morning following the burglary he observed the damage done in the restroom by virtue of the towel rack having been torn off leaving a hole about a foot in diameter. He also observed that a lock had been torn or twisted off of the grease rack door which would allow the burglars to exit at that place. He testified that the lock was lying on the floor having been torn or twisted off. His testimony concerning forcible exit is supported by the police officer who stated that in his opinion the burglar could not have exited through the small hole in the restroom carrying the large cash register with him. From all these facts and circumstances we believe that the jury was perfectly justified in answering Special Issue No. 1 in the manner which it did. There was not only some evidence but adequate evidence, in our opinion, to justify the answer of the issue.

Much has been said and written on what constitutes visible marks of force or violence in connection with burglary policies. Couch on Insurance, 2d Ed., § 42:128, et seq. In National Surety Co. v. Silberberg Bros., 176 S.W. 97 (Tex.Civ.App., El Paso 1915), the court found that evidence of throwing a lock bolt was unquestionably evidence of force and violence within the terms of a burglary policy.

In the case of Bernard v. Employers Liability Assurance Corp., 233 Ill.App. 229 (1924), the evidence revealed that the burglar had removed the cylinder of the lock from the front door of a store to gain entry. The court held that such removal of the cylinder of the lock from the door left such a visible mark of violence by means of some tool used by the burglar as was required by policy of burglary insurance although no marks were left upon the remaining portion of the lock or upon the door.

In the instant case we think it would require a strained and unreasonable construction of the policy to say that positive evidence of a broken or twisted lock from a door would not be evidence of visible marks or signs of exit from the premises.

We have carefully examined appellant's "no evidence" and "insufficient evidence" points in the light of the applicable rules and overrule same.

By its seventh and last point of error appellant contends that the trial court erred in refusing to permit it to offer into evidence the fact that appellee had a prior burglary and claim against the appellant on the same premises several months before the date of the present claim. In this connection it was shown that appellee had sustained a prior burglary on December 26, 1965, such claim involving merchandise somewhat similar to that being lost on March 17, 1966, and made the basis of the present claim. We see no reversible error reflected by the action of the court in refusing to admit into evidence the prior unrelated burglary. It was not demonstrated how the 1965 incident could have any bearing upon any issue in the instant case. Any possible probative value of such evidence is outweighed by the danger of unfairly prejudicing the claim of appellee. Southern Truck Leasing Co. v. Manieri, 325 S.W.2d 912 (Tex.Civ.App., Houston 1959); Martinez v. Williams, 312 S.W.2d 742 (Tex.Civ. App., Houston 1958). Appellant's seventh point is overruled.

The judgement of the trial court is affirmed.