## SCHUBACH v. AMERICAN SURETY CO. OF NEW YORK.

No. 4723.   Decided January 5, 1929.   (273 P. 974)

334

*Cheney, Jensen & Stephens,* of Salt Lake City, for appellant.

*Wilson & Barnes* and *E. A. Rogers,* all of Salt Lake City, for respondent.

GIDEON, J.

This action was instituted to recover upon four insurance policies, for loss alleged to have been sustained by reason of felonious extraction from a safe in plaintiff's premises of certain jewelry and money on the morning of March 9, 1927. The complaint contains four causes of action separately stated. The issuance and delivery of the policies by the defendant to the plaintiff is admitted by the answer. That the policies were in force at the time of the alleged burglary is conceded. The several policies are attached to the defendant's answer as exhibits and made parts thereof. Defendant denies liability.

The case was tried to the court and a jury. Verdict was in favor of plaintiff. From the judgment entered on the verdict, defendant appeals.

On March 8, 1927, plaintiff was conducting a retail jewelry store at 172 Main street in Salt Lake City, Utah. In the rear of plaintiff's place of business he had a Mosler safe in which was stored valuable jewelry during nighttime. It is claimed that the jewelry and money lost was feloniously taken from this safe. The safe had two outside doors. The doors when closed came together in the center of the front of the safe. The lock on this door or these doors was a combination lock. On the inside of the safe was another door referred to as a fireproof or dustproof door. This door was also composed of two parts, and when closed the parts came together in the center of the safe. This inside door locked automatically when closed, but did not have a combination lock, and was opened by the use of a key. In the interior and about the center of the safe was a small chest designated as a cash chest or subtreasury. This inner chest was made of steel. It had a single door of rolled steel. It closed to the left as one faces the safe. There was a spring bolt lock on its rear. When the door was closed, this bolt automatically entered a slot cut in the door stop placed there to receive it. The door stop was a thin strip of metal extending verti-

cally along the left of the inner chest and was screwed to the latter so as to permit the door when closed to be approximately flush with the front edge of the lining of the chest. This lining is frequently referred to in the record as the door jamb. In the interior of the chest were two small wooden drawers. These inner drawers were moved into place and withdrawn by means of two wooden knobs on each drawer. There was a wooden partition between the upper and lower drawer and also a light strip of wood running along above the upper drawer and against the upper part of the inner chest. This partition and this strip were made of light wood and would not resist any great pressure. There was a small lock on the edge of the walls of both inner drawers. They were locked with a key, and when locked a small bolt would extend up into the partition and strip last above referred to. The valuables which it is claimed were taken, according to the testimony of the witnesses for plaintiff, were placed in these small drawers within this inner chest at the close of business on the evening of March 8th.

At the time of the burglary, plaintiff had in his employ working at his place of business Joseph Van Steeter, Robert C. Starr, John I. Thomas, and Mrs. Jennie Landaw. Mr. Van Steeter is sometimes referred to in the record as the chief clerk. He was in charge of the business when plaintiff was absent. Van Steeter and Schubach had the combination to the lock on the outer doors of the safe and also a key each to the inner dustproof doors. Mr. Schubach only had a key to the inner chest door. It also appears that there was a small wooden drawer without a lock immediately above this inner chest. The key to the inner chest was kept in this drawer along with other personal belongings of the plaintiff. The key was in the bottom of this drawer under some papers. It is the testimony of plaintiff's witnesses that at the close of business on the evening of March 8th, valuable jewelry, consisting of diamonds and other valuable stones, together with a certain amount of money, was

placed within the drawers in this inner chest; that the doors to the chest and the inner doors were securely locked; that the outer doors were closed and locked and so adjusted that they could not be opened without manipulating the combination or using violence. At the close of business, Van Steeter, with another employe, went to a restaurant. There they had dinner, after which they attended a class at a night school. At the close of this night school, Van Steeter drove immediately to his home in the western part of the city. He was unmarried and lived with his father and mother. On arriving at his home he found his father and mother absent. They had gone to a picture show. Shortly after entering the house he heard a knock on the front door. Upon opening the door he was confronted by three men, strangers to him. Some conversation was had between Van Steeter and these strangers. They called him by his first name, advised him that they were familiar with the Schubach place of business and knew his relationship to that business. They demanded that Van Steeter give them the combination to the safe. At first Van Steeter declined to do this. The demand was repeated, and a gun was pressed against his back with a threat that unless he gave them the combination they would shoot. It is Mr. Van Steeter's testimony that he first gave to the intruders a fictitious combination, but that later, when he was told that if he had not given the correct combination great bodily injury would be inflicted upon him, he gave the burglars the correct combination to the lock on the outer doors of the safe. In the meantime, however, Van Steeter's parents had returned to the home. They were immediately taken into custody by the burglars and cautioned against giving any alarm, made to seat themselves facing the north wall of the room with their backs to the intruders. The son was also compelled to assume the same position, and all were kept in this position during the rest of the night. Two of the strangers all of the night, and part of the time three, were present in the home of the Van Steeters until about 7 o'clock in the morning. At about midnight the burglars

demanded the key to the safe from young Van Steeter. The latter replied by stating that the key was in his pocket. They then took a bunch of keys from him. Nothing was taken from the Van Steeter home nor from the person of the father, the mother, or young Van Steeter, except the bunch of keys. At about 7 o'clock in the morning of March 9th, some one appeared and reported that the "job" had been finished. The burglars thereupon cautioned the Van Steeters not to make any outcry or give any alarm for a period of 15 minutes. Thereupon the burglars disappeared, and, so far as this record discloses, no trace has since been found of them or the jewelry which it is claimed was taken from plaintiff's place during that night. Shortly after the burglars left the Van Steeter home, an attempt was made to call the police station, but it was ascertained that the telephone wires had been disconnected. Young Mr. Van Steeter immediately got his automobile and drove to the police station, while his father went to a neighboring telephone and called up the plaintiff. Mr. Schubach immediately repaired to his place of business. Before he arrived there, one of his employes, Mr. Starr, who had a key to the outside door of the store, had already arrived. The two drawers from the inner chest of the safe were outside of the safe and were located on a table or somewhere in the rear room, and a lot of other jewelry, such as watches and what is designated as "cheaper jewelry," was scattered over different places in this rear room of the building. The drawer immediately over the inner chest in the safe was found in one of the back rooms. The key to the inner chest and the other personal belongings of plaintiff were in that drawer, and the private papers under which this key was kept were intact. There was no indication or evidence that the burglars had the use of this key in opening the door of the inner chest.

At the close of plaintiff's testimony motion for nonsuit was interposed by defendant, and at the close of the testimony in the case motion for a directed verdict. Both were

denied. The rulings denying these motions are assigned as error.

The motion for nonsuit and the motion for a directed verdict are substantially the same. The principal claim in both of these motions is that there was no substantial evidence in the record to support a judgment in favor of plaintiff.

The refusal of the court to give certain requested instructions to the jury, and the giving of other instructions, as well as the rulings of the court in the admission of certain testimony, are also assigned as error.

Three of the policies of insurance sued upon contain the following provisions:

"A. To indemnify the Assured *for all loss by burglary* occasioned by the abstraction of any of such property from the interior of any safe or vault described in the Schedule and located in the assured's premises, by any person or persons making felonious entry into such safe or vault by actual force and violence of which force and violence there shall be visible marks made upon such safe or vault by tools, explosives, chemicals or electricity.

"B. To indemnify the Assured *for all damage* (except by fire) to such safe or vault and to said property contained therein, and to the premises including furniture and fixtures therein, caused by such person or persons making or attempting to make such entry into such safe or vault as aforesaid."

There is a like provision, differently worded, in the policy which is the basis of the fourth cause of action. It is not disputed by counsel that in legal effect the provisions in all of the policies are the same.

When the plaintiff and his employe, Mr. Starr, arrived at the store on the morning of March 9th, the outside doors of the safe were locked. Later on, upon the arrival of Mr. Van Steeter, who had first gone to the police station, Van Steeter opened the safe by manipulation of the combination. He found no difficulty in so doing. It seems to be conceded that nothing that the burglars did had disturbed or ren-

dered useless the combination of the outer door or doors. There is testimony, and the photographs before us corroborate that testimony, that on the morning of the 9th one of the ornamental knobs of the center hinge of the right-hand outer door was off. The same was found lying near the safe on the floor. It is the testimony of the plaitiff and his witnesses that they had never before observed this knob being off. There were indentures on the knob at the time it was introduced in evidence which indicated that it had been struck with a hammer or other heavy instrument. When these outside doors were closed and the handles by which they were opened and closed were in place, that is, vertical with the safe, the combination was then thrown off, and the doors could not be opened without again adjusting the combination. The upper end or knob of the left handle, by which the outer doors were opened, showed marks indicating that it had likewise been struck with a hammer or other heavy instrument. In opening the safe on the morning of the 9th, Mr. Van Steeter manipulated the combination and without difficulty opened the doors. A Mr. Fowler testified in the case. This witness was engaged in the safe and lock business. He stated that he did all kinds of lock and key work, opening and repairing locks and safes and changing combinations. On the morning of March 11, 1927, at the request of the defendant company, he examined the safe at plaintiff's place of business. He went over the combination dial, also the handle that threw the bolts, and found nothing whatever wrong. He twisted the dial to see if it swung freely and found that it did. He tried the lock on the inner double doors, examined the drawers contained in the money chest, and according to his testimony, found nothing wrong and no marks of violence on the outside doors of the safe. He stated that the dial working the combination turned freely and was not bound. He further stated that if the dial had been struck a blow with a heavy instrument it would have been bound. He also stated that in his opinion, from his experience as a safe man,

striking the handle on the outside door of the safe "would have no effect whatever with reference to opening the safe, even though the handle was broken off." Neither the fact that Mr. Van Steeter opened this safe by manipulating the combination on March 9th, nor the testimony of Mr. Fowler, is anywhere disputed in the record. It is thus claimed that from this undisputed testimony—and it is apparent—that no force was used upon these outer doors which in any way enabled the burglars to gain admission to the safe. There is no claim made that there was any evidence of violence used on the inner or dustproof doors. It is apparent that these doors were unlocked by the use of a key, and it is a fair inference that they were unlocked with the key taken from Mr. Van Steeter at his home during the night of March 8th.

The court instructed the jury that the burden was on plaintiff to prove that at the close of business on March 8th the safe was properly closed and locked with the combination thrown off, and that the property alleged to have been stolen was then inclosed within the safe; that plaintiff's safe was entered, and the property, or some of it, described in the complaint, was stolen therefrom; that entry into the safe was accomplished by actual force and violence, of which force and violence there were visible marks made upon the safe by tools, explosives, chemicals, or electricity; that entry was not effected by the use of a key or by the manipulation of the combination and without actual force and violence of which there were such visible marks; that plaintiff was the owner of the property at the time of the alleged taking and also the value of the property taken. The court further instructed the jury that any force or violence, if any, by which the burglars extracted the combination and key or keys from Van Steeter, is not the kind of force and violence referred to in the policies of insurance, and also that if the jury should find that the only force and violence used was the force and violence by reason of which young Van Steeter was compelled to disclose the combination to the safe and

deliver the key or keys to the robbers, plaintiff could not recover. The court further instructed the jury that even though they found that there were marks made on the safe evidencing an attempt at violent entry by the use of tools, but nevertheless found that the safe was entered by the use of the combination and key or keys rather than by the use of tools, and without the aid of such force and violence, the existence of the marks in such circumstances should be disregarded and their verdict should be for defendant.

The eighth and ninth instructions of the court were:

"8. Evidence has been introduced in this case concerning certain marks alleged to exist upon the handle of the outer doors and upon the knob of one of the hinges of the safe.

"You are instructed that the expression 'visible marks' as used in the phrase 'entry into the safe by actual force and violence, of which force and violence there shall be visible marks made upon the safe by tools,' refers to visible indications of the use of tools directly upon the safe, the use of which tools resulted in gaining entry into the safe. The presence on the safe of marks which were not occasioned by the use of tools resulting in an entry into the safe would be insufficient to render the defendant liable. In other words, mere scratches, blotches or abrasions appearing upon the safe but which under the evidence you may find are unconnected with an actual violent entry into the safe are immaterial. Therefore, unless you find from a preponderance of the evidence that the marks alleged to be visible upon the safe were caused by such force and violence through the use of tools as actually resulted in gaining entry into the safe your verdict must be for the defendant.

"9. The court instructs you that the felonious abstraction of money or property from the safe of the plaintiff after entrance into the inner chest (sometimes referred to as the sub-treasury of said safe), effected by the use of tools, is within the terms of the policies of insurance offered in evidence where tools were used upon the steel door of said inner chest or sub-treasury of said safe, notwithstanding the fact that the outer door of said safe was opened by using the combination, and notwithstanding that the dust or fire proof doors of said safe were opened by the use of a key."

No exception was taken to the eighth instruction, and no complaint concerning the giving of the same is here made.

Therefore that instruction, so far as this appeal is concerned, is conclusive upon the parties. As elsewhere stated in this opinion, it is not shown that any force applied to the knob or the hinge, or to the handle of one of the outer doors of the safe, aided in gaining entrance to the safe. Even though the marks were made by a hammer or other instrument in displacing the knob or in battering the handle of the outer door, the testimony is conclusive that such displacing the knob or battering the handle in no way enabled the burglars to gain entrance into the safe. It must therefore necessarily follow that, under the court's eighth instruction quoted, any force used in displacing the knob or in battering the handle did not influence the jury in returning a verdict for plaintiff.

Exception was taken to the court's ninth instruction, and the giving of that instruction is assigned as error. It is earnestly argued here, as it was in the trial court, that the application of force to the inner chest door, if any force was shown to have been used, is not within the terms of the policy.

The language of the policy quoted is that there "shall be visible marks made upon such safe or vault by tools, explosives, chemicals or electricity." It appears from the policy that defendant knew the construction of this safe and knew the number of doors by which entry could be had into the interior of the safe and also into the inner chest or subtreasury. There is a schedule in the policy in which the name of the insured appears, the location of the building wherein the business of plaintiff was conducted, and other information for the benefit of the insurer. A description of the safe is contained in item 8 of the schedule. In that item it is stated that the outer doors of the safe are locked with a combination lock, the inside with a key lock, and the inner chest door also by a key lock. It thus appears that the insurer knew that the safe not only had outside doors with a combination lock, but that it had middle doors and a chest door with key locks. It is a fair inference to charge the

defendant with knowledge that valuables would be placed within the inner chest. The contract of insurance was to protect plaintiff against burglary accomplished by force and violence. It is reasonable construction of the terms of the policies involved in this case to hold that the intent of the policies was that the indemnity should extend to and protect the insured against loss resulting from forcibly gaining entrance into this inner chest, even though the "visible marks" of such forcible entry be found only upon the inner chest. There is nothing in the language of the policies quoted to indicate that it was understood that the marks of violence should be on any particular part of the safe, either the exterior or the interior. Independent of the rule of construction recognized by all the authorities that, in case of doubtful or ambiguous language in a policy of insurance, it should be construed most strongly against the insurer and liberally in favor of the insured, we are of the opinion that a reasonable and fair construction of these policies authorized the giving of instruction No. 9.

The Supreme Court of West Virginia, in a very recent case, *C. Kalbitzer Co.* v. *Travelers' Indemnity Co.*, 142 S. E. 251, had under consideration a burglary policy of insurance containing provisions similar to the provisions in the policies under consideration here. In the course of the opinion in the West Virginia case the court said:

"But according to the terms of the policy, it is apparent that right of recovery was not made to depend on force and violence so manifested, on the outside door of the safe, or on both doors, as provided in some policies of indemnity of this same character. Such force and violence manifested on any part of the safe sufficient to make an entry will satisfy the terms and conditions of the policy upon which liability of the surety is made to depend."

The court in that case cited as supporting its judgment a number of the cases relied on by respondent here. The following cases lend support to our conclusion on this phase of the case. *Schlessel* v. *Massachusetts Bonding & Ins. Co.*,

130 Misc. Rep. 778, 225 N. Y. S. 301; *Fidelity & Casualty Co. of N. Y.* v. *Sanders,* 32 Ind. App. 448, 70 N. E. 167; *Johnston* v. *Fidelity & Deposit Co. of Maryland,* 220 Mo. App. 753, 275 S. W. 973; *Moskovitz* v. *Travelers' Indemnity Co.,* 144 Minn. 98, 174 N. W. 616; *Fidelity & Casualty Co. of N. Y.* v. *First Bank of Fallis,* 42 Okl. 662, 142 P. 312; *National Surety Co.* v. *Silberberg Bros.* (Tex. Civ. App.) 176 S. W. 97; *National Surety Co.* v. *Chalkley* (Tex. Civ. App.) 260 S. W. 216.

It is, however, very earnestly further contended by the appellant that if it be admitted that force or violence used in order to gain entrance into the inner chest falls within the terms of the policy, there is, nevertheless, no substantial evidence in this record of any force or violence that enabled the burglars to gain or assisted them in gaining entrance into the inner chest of the safe. That claim or contention presents the most serious question on this appeal.

The lock on the door of the inner chest was on the inside of the door. It automatically locked when the door was closed by the bolt in the lock passing into a slot in the door stop. The edge of the door fitted close against the door jamb or lining of this inner chest. The lock on the inner chest door was fastened to the door with three metallic screws. These screws when in place came through the steel door and were flush with the outside of the chest door. There is some evidence that on the morning of the 9th this lock was slightly loose on the door. One of plaintiff's witnesses testified that upon opening the inner door he tightened the screws with his fingers. There is no evidence, however, that any of the threads on the screws were broken or that there had been any pounding on the ends of the screws that extended through the door to its outer edge. The lock, however, was substantially attached to the door, and there is nothing to indicate that by reason of it being loose, if it was loose, there had been any force or blow, or that such fact in any way aided the burglars in gaining

admission to this inner chest. It appears from the testimony of the witnesses, however, and likewise appears from the photographs introduced in evidence, that on the wooden partition extending vertically up and down the left side of this inner chest, and which divided it from other compartments of the safe, also upon the door jamb and door stop, there were certain abrasions or marks opposite the lock on the chest door. The fact of the presence of these scratches or abrasions is not denied by defendant. That these scratches or marks constitute any evidence of violent entry into the safe, however, is very strenuously denied by defendant. Testimony was introduced on the part of defendant by experts to the effect that it would be impossible to open this inner chest door by the use of tools without leaving marks other than and in addition to the scratches or abrasions that appear on the door jamb and the door stop; that the marks or abrasions on the door stop and door jamb could not have been made by any instrument placed between the door when closed and the door jamb. There was also testimony on the part of defendant that the marks on the door stop could not have been made when the door was closed. Mr. Plumb, an expert testifying on behalf of defendant, quoting from the abstract, said: "It is not possible in my opinion for those marks on the doorstop to have been made while the door was closed because there is no space between the two when the door is closed to perform such an operation. They fit quite tightly together. If you separate the door from the jamb with the door still closed I don't think those marks could be made. I could see how those marks could be made by slamming the door against the stop and having something sharp in between, a key or something of that sort, but that is done when the door is partially opened."

The results of attempts made subsequent to March 9, 1927, to open the door of the inner chest of this safe, and also the steel door of the safe of a similar make, were detailed to the jury. The marks or abrasions resulting from these attempts lend some support to the contention of ap-

pellant that the marks or abrasions on the walls of the chest and the door stop were no evidence of a forcible entry into this inner chest.

The testimony of the plaintiff and his witnesses is positive that an entrance had been made into this inner chest some time between the close of business on March 8th and the morning of March 9th, and that valuable jewelry had been taken therefrom, presumably by the persons making such entry. The testimony of a police officer, who appeared on the scene early on the morning of the 9th, is likewise to the effect that every indication pointed to the felonious taking of the jewelry claimed to have been placed in this inner chest. There is nothing to indicate that the burglars found and used the key to this inner chest which plaintiff testified was kept in the wooden drawer within the safe immediately over the inner chest. Entry into this inner chest was made possible either by the use of force and violence or by the use of a key. All of plaintiff's testimony is to the effect that these marks or abrasions on the door jamb and the door stop were made there during the night of March 8-9. Plaintiff's employes testified that they had never observed or noticed these marks or abrasions on the door jamb or the door stop prior to the morning of the 9th of March. The plaintiff, quoting again from the abstract, testified as follows: "Referring to the inner chest  *  *  *  I saw markings  *  *  *  on the south side of the chest,  *  *  *  and I noticed that lock as to whether it was loose or not that morning.  *  *  *  It was tight the night before. On the morning of the 9th Mr. Starr gave both screws two or three turns. He tried to fix it as near as he knew how, tightening it up. I saw the tongue of that lock, the little tongue that runs out and holds the lock when the door is shut. If you push that door shut it will lock itself. With the dust doors, the first inside doors, you shut them and then have to turn the knob before they lock. There is no knob on the inside chest. I saw the marks that morning  *  *  *  immediately on the edge of the inner chest door.

They appeared to be fresh. I did not ever notice them before. If a person walked up to that door he would notice them quite as readily on the door itself as you see them shown on that picture. * * They were never there before to my knowledge. I never saw them before. I am positive they were never there before. The little bolts or locks of the inner drawers of that chest were both up. With reference to the wooden framework where the bolts would be when locked, the bottom drawer like it was almost torn off entirely and where the bolt is on the top there is a little wood torn out on the partition where the bolt is up. The place was torn out where it would have been if the drawer were in place and the bolt locked. The place was one-half inch in length. It is the same condition now as it was the first time I saw it on the morning of the 9th. It went clean through the wood. That was the lower drawer and the lock of the drawer was almost out. I had it put back on."

There was the testimony of a Mr. Flower, witness on behalf of plaintiff, who stated that he had been engaged in the safe and lock business in Salt Lake City for a period of 18 or 20 years. He was employed by plaintiff to change the lock and the combination on the safe after this burglarly. He testified that so far as he could remember he believed he saw marks on the edge of the door of the inner chest when he took the lock off to repair it; that he saw on the picture exhibited to him certain marks or scratches; that he had made certain experiments a week or so before the trial in opening the door to the inner chest; that he took a piece of wire, put it in the lock, and unlocked it; that when he manipulated the lock with the wire he inserted a screwdriver between the door and the door jamb, and in that way opened the door to the inner chest. There is, however, no testimony in the record that the making of these marks or abrasions by the use of tools enabled the burglars to gain entrance into this inner chest. That is to say, conceding that the marks and abrasions found on the wooden partition and the door jamb of the chest were made

by the use of tools on the night of March 8th, the marks and abrasions are such that they are not evidence of the use of tools which enabled the burglars to open the door on this inner chest or to gain admission into the inner chest. Nor is there any testimony of an expert or other witness that in making these marks or abrasions by tools, if so made, entrance was or could have been thereby gained into the inner chest. The fact disclosed by the record that the door of the chest fitted closely against the jamb of the door, and that any effort to force a screwdriver or other tool between the door and the jamb would of necessity leave some marks or abrasions, leaves it reasonably clear that mere scratches on the wooden partition or on the outer edge of the door jamb would constitute no substantial evidence of the use of tools in gaining admission to the inner chest.

No witness who testified in this action explained, or attemped to exlpain, how a forcible entry could be made into the inner chest by the use of tools leaving the marks that the evidence shows were found on the wooden partition, door jamb, and door stop of the inner chest. Counsel for plaintiff has not in his oral argument or in his brief shown, or attempted to show, how the marks on the inner chest could have been caused by tools used in making a forcible entry into the inner chest. In reading the record we are unable to see how the marks on the inner chest could have been made by the use of tools in making a forcible entry therein.

There is considerable evidence about certain abrasions or marks found on the bevel edge of the bolt of the lock of the inner chest, and there is testimony that these marks or abrasions had never been seen by any one prior to the morning of March 9th. It is apparent from the construction of that lock that a burglar attempting to gain admission by the use of a screwdriver or other instrument forced between the door and the door jamb could not by any possible means make or cause these abrasions or scratches on the bevel adge of the tongue in the lock in the inner door. The

bevel edges of the tongue or bolt are on the inside of the door when the door is closed. With the tongue or bolt in place, the bevel edge would be on the inside of the chest and inserted in the slot in the door stop, and could not be reached from the outside by any instrument while the door was closed. It further appears from the testimony that during later experiments in opening this door in forcing a screwdriver between the door jamb and the door opposite the lock, the bolt on the inner lock was bent, and in an effort to straighten it the bolt broke. Thereafter a new bolt or tongue was placed in the lock, and after a few days' use similar scratches were found on the bevel edge of the new bolt. It thus appears that not only was it impossible to make the so-called scratches or abrasions on the bolt with any instrument from the outside while the door was closed, but that these abrasions or marks must have resulted from the insertion of the bolt into the slot made in the door stop to receive it. We thus are brought to the conclusion that there is no substantial evidence in the record to support a finding that force or violence was used in making entry into this inner chest. From such conclusion it follows that the court should have directed the jury to return a verdict in favor of defendant, unless there is other evidence of a forcible entry into the safe.

The defendant requested the court to instruct the jury as follows:

"If you should find from the evidence that all three of the doors to the safe, that is to say, the outer doors, the large inner doors, and the door to the so-called inner or cash chest, were entered without force or violence leaving visible marks, in other words, if you should find that all of the doors were entered by the use of the combination and keys, then your verdict in this case must be for the defendant."

"If you should find from the evidence in this case that the outer doors, the large inner doors and the door of the cash chest were all opened by the combination and the use of keys, and without force or violence by the use of tools, but that the entry was gained into the drawers within the inner chest by force and violence applied to such drawers or the shelving thereof, either with or without the use of

tools, then you are instructed that such entry to such drawers does not constitute entry into the safe under the terms of the insurance policy, and your verdict must accordingly be for the defendant."

The court did not give either of these requests. Nor did it give the substance of either. It is our view that defendant was entitled to have these requests, or instructions, including the substance of such requests, given to the jury, and that failure to give the instructions, either as requested, or the substance of them, was prejudicial error.

In our judgment the terms of the insurance policies do not warrant a construction that evidence of a violent entry into the drawers of the inner chest, in the absence of force and violence having been used on other parts of the safe, renders the insurance company liable for any loss sustained by the abstraction of valuables from such inner chest drawers. There is no reference in the policies to these inner drawers. In the description of the safe the outer, inner, and the chest door are designated, but no reference is made to these inner drawers. These inner drawers were made of wood. The wooden strips that separated them were such that little force was required to gain an entrance into the drawers after opening the doors to this inner chest. The small bolts in the locks on these drawers, when locked, extended into these strips. The policies of insurance issued by defendant were burglary insurance. Liability was conditioned upon forcible entrance into the safe. There is nothing in the language of the policies or in the nature of the contract of insurance to warrant a holding that force used on these inner drawers alone would create a liability on the part of the defendant. No case has been called to our attention where a court has held that violence used upon the inner drawers of a safe under like conditions as found in this record, without evidence of other violence on other parts of the safe, renders an insurance company liable.

There is testimony in the record that the bolts of the locks of these inner drawers extended above the chest draw-

ers into the wooden partition over each drawer, and that on the morning of the 9th these drawers had been taken from the inner chest; that the bolts were then extending above the edges of the drawers; also, that there were certain abrasions or breaks on the wooden partition separating these drawers. It may well be that the jury, under the court's instructions, were of the opinion that the condition of these drawers and the wooden partition which separated them was some evidence of violence they had a right to consider on the question of making forcible entry into the safe. Holding, as we do, that gaining admission into these inner drawers by the use of force and violence only, and without evidence of other violence, is not, under the terms of the policies, sufficient to render the insurance company liable, it must necessarily follow that the failure to give the requested instructions, or some other instructions embodying the substance of the requests, was prejudicial error.

As a new trial must be granted, it is advisable, and we are required in this opinion, to consider other claimed errors.

We are not to be understood as holding, neither do we hold, that the refusal of the court to give the requests to be hereinafter noted, in view of the general instructions given by the court, nor the rulings of the court upon the admission of certain testimony against the objection of plaintiff, would necessarily work a reversal of the judgment.

The court's refusal to instruct the jury, as requested by defendant, to the effect that under the terms of the policies of insurance defendant would not be liable unless the burglary was acomplished by a felonious entry into the safe, and that in order to come within the terms ■ of the policies the safe must have been entered in the course of a genuine burglary taking place without the knowledge, consent, connivance, or complicity of plaintiff, and that the burden is upon plaintiff to establish such facts by a preponderance of the evidence, is assigned as error. The court instructed the jury that the insurance policies

introduced in evidence represented the contracts between plaintif and defendant, and that the liabilities of defendant must be measured strictly by the terms of the policies, and that it was the province of the jury to determine whether or not plaintiff had sustained a loss which falls within the express terms of the policies. Likewise, that the burden was on plaintiff to prove by a preponderance of the evidence that he had sustained a loss falling within the strict terms of the policies. In our judgment the court might well have given this requested instruction, especially in view of the so peculiar and unusual circumstances of this case. However, the failure to give the requested instruction, if error at all, ought not to be held to be so prejudicial that standing alone it would work a reversal.

Defendant requested the court to instruct the jury to disregard all evidence of marks upon or violence to the handle of one of the doorknobs of the safe and the knob of one of the hinges. By reason of the fact that it conclusively appeared from the testimony that any marks of violence upon the handle of the doorknob or upon the knob of one of the hinges did not in any way enable the burglars to gain admission to the safe, the court should, in our judgment, have given this request. However, as the court did instruct the jury that any evidence of violence upon the safe that in no way contributed to or assisted in gaining entrance should be disregarded, we do not regard the failure of the court to give this requested instruction error requiring a reversal of the judgment.

Plaintiff was permitted to introduce in evidence a letter written by defendant in May, 1927, canceling the policies theretofore issued to plaintiff. The introduction of that testimony was strenuously objected to by defendant, and the ruling of the court admitting it is assigned as error. Under the terms of the policies, the insurance company could cancel them by giving the required notice and refunding part of the premiums paid. Regardless of the company's right to cancel the policies, any

evidence tending to show that the policies had been canceled after the claimed burglary must of necessity be wholly immaterial to the issue made by the pleadings in this case. It is conceded that the policies were issued by defendant and that they were in full force and effect at the date of the burglary. The rights of plaintiff and the liability of defendant are necessarily to be measured by the terms of the policies then in force. Any subsequent cancellation or attempted cancellation of them could not affect the rights of plaintiff or the liability of defendant. It will readily be seen that the testimony may have been prejudicial. While we do not hold that the admission of that testimony would work a reversal of the judgment, we are clearly of the opinion that the testimony was immaterial and irrelevant to any issue to be determined and that the objections thereto should have been sustained.

There was also testimony introduced as to the relative amount of premiums charged by defendant for burglary insurance in Salt Lake City compared with the premiums charged for like insurance in other cities, such as Denver and Los Angeles. It is our view that this testimony likewise was wholly immaterial to any issue to be determined in this case. The parties had made their contract. The premiums which defendant demanded for the issuance of the policies had been paid, and the amount of those premiums, whether greater or less than charged by defendant for like insurance in other cities, was not material. There is no claim that defendant coerced plaintiff into buying insurance, or that any representations were made by the officers or representatives of defendant that the premiums charged were greater or less than the premiums charged for like insurance in other communities.

From what has been said, it necessarily follows that the judgment of the court below must be reversed and the cause remanded to that court for a new trial. Such is the order. Appellant to recover costs.

THURMAN, C. J., and CHERRY and HANSEN, JJ., concur.

STRAUP, J. (concurring).

I concur in all of the rulings of the prevailing opinion. The only disagreement I have is as to the interpretation of the policy; as to the meaning of the language "entry into such safe or vault," and abstraction of property "from the interior of any safe or vault." The safe in question is something like 4½ or 5 feet high and about 3½ feet wide and about 16 or 18 inches deep, inside measurement. It has two outside heavy steel doors manipulated by a combination lock. Inside of these are two lighter steel doors, referred to as fireproof doors or dustproof doors, opened and closed by means of a lock and key. These two sets of doors constitute the wall of the safe, the entrance to it. The interior of the safe is made up of numerous compartments, some open, where trays of jewelry and other articles were kept, tiers of numerous small drawers, and a compartment referred to as the "inner chest." This inner chest is but about 12 inches wide, 10 or 10½ inches high, and about 15 inches long extending to the back of the safe. It is inclosed by a light steel door manipulated by a lock and key. The chest is in about the center of the interior of the safe. Below it are open compartments extending across the width of the safe; above it a tier of small drawers, and on either side of it tiers of drawers and open compartments. The chest itself contained a small open compartment and two small wooden drawers about 11¾ inches wide, 2½ inches high or deep, and about 14 inches long extending to the back of the safe. In these drawers, as testified to by plaintiff's witnesses, principally were kept diamonds and other valuable jewelry and from which the greater part of the valuable property was taken, in value about $30,000 or more.

It is the contention of the plaintiff that there was no "entry into such safe" until not only the two sets of steel

doors and the inclosed door of the chest had been entered, and not until the wooden drawers inside of the chest also had been entered. The view taken by the prevailing opinion is that no "entry into such safe" had been effected until entrance was made through the door inclosing the small chest; that the "interior of the safe" was not reached or entered until the door of the chest was entered. It is my view that the small chest, the door of which was about 12 inches wide and about 10½ inches high and inclosing only the chest, was just as much the interior of the safe as were the tier of drawers and the open compartments above, below, and on either side of the chest. These all occupied the interior of the safe. Without them there was no interior of the safe. It is my view that the safe was entered when entrance was effected through the two sets of steel doors, the outer heavy steel doors manipulated by a combination lock and the seat of doors inside thereof manipulated by a lock and key. These, as I think, constituted the wall of the safe and the entrance to it. What was inside of them constituted the interior of the safe. The language of the policy is "entry into such safe or vault." Had this been a vault and the entrance to which barred, as here, by two sets of steel doors, it could hardly be said that the vault had not been entered when entrance had been effected through the two sets of doors, and not until a small chest or compartment on the inside of the vault had been broken into or entered. I think the better considered cases and the weight of authority construing such and similar language support these views. *Blank* v. *National Surety Co.*, 181 Iowa 648, 165 N. W. 46, L. R. A. 1918B, 562; *Wakem & McLaughlin* v. *Royal Indemnity Co.*, 241 Ill. App. 427; *In re George and the Goldsmiths and General Burglary Ins. Ass'n, Ltd.* (Canada 1899) 1 Q. B. 595.

On the record I think it clear, and as stated in the prevailing opinion, the entrance through the outside and the inner steel doors was effected by the manipulation of the combination lock and by means of a key and without any

force or violence of which there were any visible marks that the entrance had been effected by such means. I also concur in the view that on the record there is not sufficient evidence to show that an entrance was effected into the inner chest by force or violence of which there were visible marks that entrance thereto had been effected by such means. But if there had been, I think that would not have helped the plaintiff any more than if there had been evidence of visible marks on one of the drawers on either side, or above, or below the chest that an entry thereto had been effected by force or violence and property taken therefrom.